## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jessy Alfaro,

               Plaintiff,

v.

United Food and Commercial Workers
International Union,

               Defendant.

Case No. 21-cv-2329 (KMM/TNL)

**ORDER**

Plaintiff Jessy Alfaro brings this action pro se against United Food and Commercial Workers International Union ("UFCW"), alleging employment discrimination based on race and gender under Title VII of the Civil Rights Act of 1964. [ECF No. 1.] Ms. Alfaro specifically asserts that UFCW discriminatorily failed to promote her, retaliated against her, harassed her, subjected her to unequal pay, and terminated her employment because of her race and gender. Before the Court are UFCW's motion for summary judgment and Ms. Alfaro's motion for leave to respond to new evidence and amend her complaint. [ECF No. 47 (Mot. for Summ. J.); ECF No. 71 (Mot. to Supp./Amend).] UFCW's motion is **GRANTED**, Ms. Alfaro's motion is **DENIED**.

### I.  Background

Ms. Alfaro, a Latina woman, started in UFCW's Organizing Department as an organizer-in-training in 2011. [Alfaro Dep. 30 ECF No. 51-1; Ex. 35, ECF No. 51-32.] After one year of employment with the union, Ms. Alfaro became an organizer and was eventually promoted to General Organizer. [Smith Decl. ¶ 6, ECF No. 52.] A union called

FAIR represented Ms. Alfaro during the entirety of her employment with UFCW.   [*Id.* ¶ 5.]

### *Region 6 Incidents*

In September 2016, Ms. Alfaro asked the coordinator of her out-of-town assignment, Jose Bustos, if she could leave early to go to the airport for her flight home. [Alfaro Dep. 33–34.] Mr. Bustos is a Latino man. [*Id.* 42–43.] Mr. Bustos suggested that Ms. Alfaro's flight was too early. [*Id.* 33–34.] Ms. Alfaro was the only woman present during the conversation. [*Id.* 34.] Other individuals present were Sergio Rocha, Manuel Merida, and Raymundo Diaz, who are Latino, and Minh Pham, who is Asian. [*Id.* 43.] After this incident, Ms. Alfaro wrote a letter to her director, Leticia "Tish" Ramirez, a Latina woman, explaining that she felt singled out when Mr. Bustos asked her why she was taking an earlier flight because she was the only woman present during the conversation and he did not ask other employees why they were taking earlier flights. [*Id.* 33:19–25, 34, 42; Ramirez Decl. ¶ 4, ECF No. 55.]

The next incident occurred in April 2017, when Carl Ariston, Ms. Ramirez's executive assistant, gave Ms. Alfaro a verbal warning for not sending in her weekly organizing goals in a timely manner. [Ramirez Decl. ¶ 6.] In April 2017, while on another out-of-town assignment, Ms. Alfaro did not attend a debrief meeting and instead drove home. [*Id.* ¶ 7.] The parties disagree about what occurred: Ms. Alfaro argues that Mr. Ariston told her that she did not have to attend the debrief meeting, while Ms. Ramirez explains that Ms. Alfaro left her work assignment early, against instructions from Mr.

Ariston.  [*Id.*; Alfaro Dep. 39–40.]  In June of the same year, Mr. Ariston issued Ms. Alfaro a write-up, signed by Ms. Ramirez, for the April 2017 incident.  [Alfaro Dep. 38–39.]

Finally, in 2018, Mr. Ariston gave Ms. Alfaro a written performance review, which Ms. Alfaro believed to be too negative.  [Alfaro Dep. 47–48; 2018 Performance Review, ECF No. 51-23.]  The performance review was the first Ms. Alfaro had received since 2014; during her nine-and-a-half years with UFCW, she received four written evaluations from different supervisors.  [Alfaro Dep. 48–49; Performance Reviews, ECF No. 51-23–26.]

### *Ms. Alfaro's Job Applications*

During her employment, Ms. Alfaro applied for several different positions within UFCW.  She first applied for a Political Coordinator position in June 2017.  [Alfaro Dep. 92; Political Coordinator Position Emails, ECF No. 51-31.]  After receiving Ms. Alfaro's application, Marcia Todd, then Director of Human Resources, emailed Ms. Alfaro explaining that her resume did not show the required four years of political experience and asked Ms. Alfaro if she had any political experience that was not listed on her resume. [Alfaro Dep. 92; Political Coordinator Position Emails, ECF No. 51-31.]  Ms. Alfaro responded that she did "not really . . . have any" political experience.  [Alfaro Dep. 92–93; Political Coordinator Position Emails, ECF No. 51-31.]  At the time, Ms. Alfaro's political experience included a three-week assignment knocking on doors of union members, sharing the UFCW's message, and evaluating voters.  [Alfaro Dep. 93; Political Coordinator Position Emails, ECF No. 51-31.]  The person UFCW hired for this position

had three years of political experience. [Smith Decl. ¶¶ 11–12; Jess Rinehart, Ex. D, ECF No. 52-4.]

Later that year, in August, Ms. Alfaro applied for a Senior Legislative Representative position. [Alfaro Dep. 93; Senior Legislative Representative Application, ECF No. 51-32.] This position required eight years of experience, and experience on Capitol Hill or as a lobbyist. [Job Description, Ex. E, ECF No. 52-5.] Ms. Alfaro did not have the required experience to be eligible for this position. [Alfaro Dep. 93, 94.] The person UFCW hired had nineteen years of experience, including eighteen years of legislative experience and experience working as a lobbyist. [Smith Decl. ¶¶ 15–16; Ex. F, ECF No. 52-6.]

In January 2018, Ms. Alfaro applied for a Research Coordinator position. [Research Coordinator Email, ECF No. 51-34.] This position required at least ten years of progressive activism experience, which Ms. Alfaro did not possess. [Job Description, Ex. G, ECF No. 52-7; Alfaro Dep. 97.] The person UFCW hired had sixteen years of experience. [Smith Decl. ¶¶ 19–20; Ex, H, ECF No. 52-8.] At the same time, Ms. Alfaro applied for another political coordinator position. [Alfaro Dep. 99, 100.] UCFW interviewed her for the position. [*Id.* 100:25, 101:2.] Again, this position required a minimum of four years of political campaign experience, which Ms. Alfaro did not possess at the time. [Job Description, Ex. I, ECF No. 52-9; Alfaro Dep. 100.] The person UFCW hired had more than six years of political experience. [Smith Decl. ¶¶ 23–24; Ex. J, ECF No. 52-10.]

Ms. Alfaro also applied for a Federal Legislative Representative position. [Alfaro Dep. 101; Application Email, ECF No. 51-37.] Marcia Todd informed Ms. Alfaro that she

did not meet the qualifications for the position. [Application Email 2, ECF No. 51-38.] Ms. Todd also explained that Ms. Alfaro was ineligible because her personnel file contained active discipline, the write-up related to skipping the April 2017 meeting. [*Id.*] The person UFCW hired had nine years of political and legislative experience. [Smith Decl. ¶¶ 27–28; Ex. L, ECF No. 52-12.]

In August 2019, Ms. Alfaro applied for the position of Deputy Legislative Director. [Application Receipt Email, ECF No. 51-39.] Ms. Todd emailed Ms. Alfaro explaining that her application materials did not reflect the required qualifications for the position, which included: at least eight years of legislative experience, experience working on Capitol Hill or as a lobbyist, and extensive knowledge of the legislative process, among other requirements. [*Id.*] She also informed Ms. Alfaro that UFCW would not interview her unless she could show that she met the qualifications. [*Id.*] Ms. Alfaro did not provide Ms. Todd with any additional information indicating that she possessed the necessary qualifications. [Alfaro Dep. 104.] The person UFCW placed in this position was a current employee who had over twenty years of political and legislative experience, including lobbying. [Smith Decl. ¶ 31; Ex. F, ECF No. 52-6.]

In September of the same year, Ms. Alfaro wrote to several individuals asking how long before she would be eligible for the Deputy Legislative Director position or any of the other positions that she previously applied for. [Email, ECF No. 51-40.] Ms. Todd responded that Ademola Oyefeso, the director of the Legislative and Political Action Department, would answer her questions and provide guidance on gaining experience for positions in the political and legislative department. [*Id.*]

5

### *Meatpacking Division and Remote Work*

Ms. Alfaro transferred to the Food Processing, Packing, and Manufacturing department in January 2019, as a General Organizer. [Smith Decl. ¶ 6.] She was the only FAIR bargaining unit member in this division at the time. [*Id.*] Another employee in this division was also a member of a union, albeit a different one. [Lauritsen Decl. ¶ 3, ECF No. 56.] Ms. Alfaro and the other employee were the only non-management staff in the division. [*Id.*]

When the pandemic hit in spring of 2020, all organizers were assigned to alternative work they could perform remotely. [Morrissette Decl. ¶ 3, ECF No. 53.] In April 2020, Ms. Alfaro was assigned to monitor UFCW's Facebook page for comments or questions from the public and UFCW members or workers. [*Id.* ¶ 5.] At one point, however, Ms. Alfaro did not respond to five comments on a publicly viewable thread, two of which required a response from the UFCW, as well as five private messages, which all required a response. [*Id.*; Email, ECF No. 53-1.]

In May 2020, Ms. Alfaro was assigned to work on a "Hustle" team led by Jenny Reed, the assistant to the director of organizing.[1] [Alfaro Dep. 9–10; Reed Decl. ¶ 1, ECF No. 54.] The Hustle assignment was Ms. Alfaro's main assignment until shortly before the 2020 presidential election, at which point she was temporarily assigned to do political work. [Reed Decl. 10.] After the election, Hustle again became her main job assignment. [*Id.*] On May 4, Ms. Alfaro was assigned to attend a Hustle orientation meeting on Zoom

---

[1] Hustle is a text message system that makes it easier for users to send many text messages.

with another UFCW employee, DJ Totty, who worked on the same Hustle team. [Morrisette Decl. ¶ 7–8, 10.] She did not attend the meeting. [*Id.*] On May 8, Ms. Alfaro was assigned to attend a debrief meeting on Zoom. [Reed Decl. ¶ 6.] After noticing that Ms. Alfaro was not on the call, Ms. Reed texted her to see if she needed help joining. [*Id.*] Ms. Alfaro informed Ms. Reed that she was having computer issues. [*Id.*; Text Messages, ECF No. 51-27.] Ms. Reed asked Ms. Alfaro to send photos of her computer or video call her so that Reed could walk her through getting into the meeting. [*Id.*] Ms. Alfaro did not send photos of her screen or answer Ms. Reed's video calls. [*Id.*] And she did not join the video call. [Reed Decl. ¶ 6.]

Later in May, Alan "AJ" Morrissette, executive assistant to the director of organizing, and Robert "Bobby" Gorham, executive assistant to the director of the meatpacking division, held a call with Ms. Alfaro to discuss her work performance. [Morrissette Decl. ¶ 1; Gorham Decl. ¶ 1, ECF No. 57; Email re: Meeting, ECF No. 51-29.] Mr. Gorham was Ms. Alfaro's direct supervisor at the time. [Gorham Decl. ¶ 2.] During the call, when discussing the Facebook monitoring incident, Ms. Alfaro explained that she did not believe she received enough technical training, though she acknowledged that she did not ask any questions during or after her training. [Morrissette Decl. ¶ 9.] She also mentioned that she was unable to monitor the Facebook page because her sister had COVID-19 symptoms and her mother had mobility problems. [*Id.*] Then, while discussing her failure to attend the Zoom meetings, Ms. Alfaro stated that she did not attend the May 4 meeting due to personal reasons and took the day off. [*Id.* ¶ 10.] Ms. Alfaro mentioned that she told Mr. Totty she would not be able to attend and would need to reschedule. [*Id.*]

As for the May 8 meeting, Ms. Alfaro explained that she was having computer issues, she put Ms. Reed on hold to try to figure out how to get the call, and she did not answer subsequent calls from Ms. Reed because her phone was silenced.  [*Id.* ¶ 11.] Mr. Morrissette gave her a verbal warning regarding falsifying her weekly itinerary report to show she was working even when she was not working.  [*Id.* ¶ 12.]

### *International Representative Promotion*

Under the FAIR contract, which covered Ms. Alfaro, a General Organizer at the top step of the scale could only be promoted to international representative, the highest position in the bargaining unit, if the General Organizer has been at the top step for one year and met the criteria for promotion.  [Smith Decl. ¶¶ 33–34; FAIR Agrmt., Ex. A, at 33, ECF No. 52-1.]  This promotion is not automatic or triggered solely by years of employment. [Smith Decl. ¶ 36.]  Although she sought earlier placement into this position, Ms. Alfaro became officially eligible for such a promotion on July 3, 2020.  [Alfaro Dep. 83–85; *Id.* ¶ 35.]  UFCW asks all directors to annually evaluate their staff using a form; however, not all directors use this form, and that evaluation forms some of the basis for being promoted unto the International Representative position.  [*Id.* ¶ 36.]  Some directors attached the form to the letter recommending that the UFCW promote a General Organizer.  [*Id.*]  According to UFCW, an evaluation is not a guarantee of a promotion, as a director may not recommend the employee for promotion or may even write a letter recommending against promotion.  [*Id.*]

For Ms. Alfaro to be promoted to the International Representative position, her director, Mark Lauritsen, needed to recommend that she receive the promotion.  [*Id.*]

Mr. Lauritsen did not evaluate her qualifications because he was not aware that he was expected to evaluate her for a promotion to International Representative or write a letter recommending for or against promoting her. [Lauritsen Decl. ¶ 4.] Mr. Lauritsen and Ms. Alfaro did not have much contact between spring 2020 through Ms. Alfaro's termination because Ms. Alfaro was doing remote work and not her typical organizing work in the organizing division. [*Id.* ¶ 6.]

### *Hustle Work Leading up to Termination*

During summer 2020, the organizing department asked UFCW employees sending Hustle messages to submit daily reports of the number of messages they sent each day. [Morrissette Decl. ¶ 4.] Ms. Alfaro submitted reports on July 30, August 13, 14, 17, and 18 detailing that she had sent between 69 and 101 messages each day and itemizing the number of conversations she had. [Alfaro Dep. 23–27; Daily Reports, ECF No. 51-16, 17, 18, 19, & 20.]

Later in Ms. Alfaro's time on the Hustle team, the requirement of itemizing messages ended, but employees continued to complete weekly itineraries indicating how many days they worked and what assignments they worked on. From November 2020 until her termination, Ms. Alfaro indicated that she spent each day working on the Hustle assignments. [Alfaro Dep. 11–23.] But in February 2021, Mr. Morrissette became aware that Ms. Alfaro was not actually sending text messages as she reported on her weekly itineraries. [Morrissette Decl. ¶ 14.] He checked the internal Hustle records for the team that Ms. Alfaro was assigned to and learned that in reality she had not sent any messages for at least the prior ninety days. [*Id.*; Call Record, ECF No. 53-2.] Mr. Morrissette and

the new HR director, Susie Smith, met with Ms. Alfaro over Zoom to ask what she had been working on.  [Morrissette Decl. ¶ 17; Smith Decl. ¶ 3.]  Ms. Alfaro responded that she had been working on Hustle work since leaving her election assignment in November 2020, but she did not provide more information.  [Smith Decl. ¶ 39.]

### Termination, Charge, and Lawsuit

On February 22, 2021, UFCW terminated Ms. Alfaro's employment. [Smith Decl. ¶ 3.] On August 11, 2021, Ms. Alfaro filed a Charge of Discrimination with the EEOC. [Dismissal and Notice of Rights, ECF No. 1-1.]  In her charge, she asserted that UFCW subjected her to different terms and conditions of employment, passed her over for promotions and opportunities, treated her less favorably than coworkers who were outside of her protected classes, and retaliated against her.  [*Id.*]  Ms. Alfaro likewise argued that she believed UFCW discriminated against her because of her race/national origin, her sex, and her participation in a protected activity.  [*Id.*]  The EEOC dismissed her charge, indicating that it would not proceed with its investigation.  [*Id.*]  The EEOC did not decide whether further investigation would establish violations of the statute. [*Id.*]

On October 19, 2021, Ms. Alfaro commenced this action alleging UFCW discriminatorily failed to promote her, retaliated against her, harassed her, and terminated her employment because of her race and gender.  [Compl. 4–5, ECF No. 1.]  She also argues that the terms and conditions of her employment differed from those of similar employees.  [*Id.*]

10

## II.     Legal Standard

The standards for summary judgment are well settled. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When the court assesses evidence before it on summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Although pro se pleadings are to be construed liberally, pro se litigants are not excused from failing to comply with substantive and procedural law." *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984) (citing *Faretta v. California*, 422 U.S. 806, 834–35 n.46 (1975)).  A district court has no obligation to "plumb the record in order to find a genuine issue of material fact."  *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996).  And the Court is not "required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Id.*  The non-moving party in a summary judgment motion may not rest on mere allegations but must produce significant probative evidence demonstrating that specific facts exist creating a genuine issue for trial.  *See Jetton v. McDonnell Douglas Corp.*, 121 F.3d 423, 427 (8th Cir. 1997) (explaining that nonmoving party may not rest on complaint alone and "must introduce affidavits or other evidence to avoid summary judgment").

### III.   Discussion

Ms. Alfaro brings several claims: failure to promote, hostile work environment, unequal pay, retaliation, and termination, all in violation of Title VII.  UFCW argues that many of Ms. Alfaro's claims are time-barred, and that all of the claims fail as a matter of law.  Ms. Alfaro also requests leave to respond with new evidence and to clarify the unequal pay claim in her Complaint.  The Court grants UFCW's motion for summary judgment and denies Ms. Alfaro's motion.

### A.  Failure to Promote

In her Complaint, Ms. Alfaro identifies numerous occasions on which she alleges that UFCW's unlawfully failed to promote her.  She first argues that UFCW discriminated against her when it failed to promote her to several specific jobs she applied for between 2017 and 2019, including Political Coordinator, Senior Legislative Representative, Research Coordinator, a second Political Coordinator position, Federal Legislative Representative, and Deputy Legislative Director.  Ms. Alfaro next asserts that UFCW discriminatorily failed to promote her to the position of International Representative. Finally, she argues UFCW unlawfully failed to promote her to a management position in the meatpacking division.  [Compl. ¶¶ 5–6.]  UFCW argues that it is entitled to summary judgment on all aspects of this claim because much of it is time barred and because Ms. Alfaro has not presented evidence showing that she was qualified for the positions at issue.  While her desire for a promotion to a better job with greater responsibilities is

understandable, the Court finds that Ms. Alfaro's failure to promote her claim fails as a matter of law.

### 1. Statute of Limitations

UFCW argues that Ms. Alfaro is time-barred from bringing her failure to promote claim with respect to the many jobs she applied for between June 2017 and August 2019, given that she filed her charge on August 11, 2021.[2]  The Court agrees.

Title VII gives complainants a limited amount of time to file a charge of discrimination.  42 U.S.C. § 2000e–5(e)(1).  A complainant must file a charge with the EEOC within 180 calendar days of the day the discrimination took place.  *Id.*  The 180-calendar day filing deadline is extended to 300 calendar days if a state or local agency enforces a law that prohibits employment discrimination on the same basis.  *Id.*  Here, there is a state or local agency, the Minnesota Department of Human Rights, that enforces a law, the Minnesota Human Rights Act, that prohibits employment discrimination on the same basis.  Therefore, because Ms. Alfaro filed her charge on August 11, 2021, she can recover for acts beginning on October 15, 2020.

---

[2]  UFCW also asserts that her two other failure-to-promote allegations, the International Representative and the management position, are time-barred to the extent she alleges she should have been promoted prior to October 15, 2020. [Memorandum of Law in Support of UFCW's Motion for Summary Judgment at 16, ECF No. 65.]. While true, that is not fatal to either claim because the record suggests that both of these jobs are simply promotions that, once eligible, Ms. Alfaro could have received at any time. Because her eligibility continued into the permissible time period for this lawsuit, these two positions are not time-barred.

Ms. Alfaro applied for the specific positions at issue between June 2017 and August 2019.[3]  Because the statute bars claims arising more than 300 days before the date of the plaintiff's charge, Ms. Alfaro is barred from bringing claims related to any promotions for which she applied prior to 2020.

### 2.  The Prima Facie Case

In addition to some of them being time-barred, each aspect of her failure-to-promote claim fails on the merits. To succeed on a claim related to hiring or promotion, a plaintiff must show "(1) she is in a protected class; (2) she was qualified for an open position; (3) she was denied that position and (4) the employer filled the position with a person not in the same protected class." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (quoting *Dixon v. Pulaski County Special Sch. Dist.*, 578 F.3d 862, 867–68 (8th Cir. 2009)).  When "the employer contends that the selected candidate was more qualified for the position than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision.'"  *Id.* at 1048 (quoting *Chock v. Nw. Airlines*, 113 F.3d 861, 864 (8th Cir. 1997)).  "The ultimate burden then falls on the plaintiff to produce evidence sufficient to create a genuine issue of material fact regarding whether the defendant's

---

[3] Ms. Alfaro applied for positions with UFCW on the following dates: Political Coordinator (June 2017); Senior Legislative Representative (August 2017); Research Coordinator (January 2018); Political Coordinator (January 2018); Federal Legislative Representative (January 2018) Deputy Legislative Director (August 2019).

proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *See id.* at 1046 (cleaned up).

However, based on the record submitted, a reasonable factfinder could not find in Ms. Alfaro's favor because she fails to put forth sufficient evidence showing that she was qualified for many of the positions, and has failed to "produce evidence sufficient to create a genuine issue of material fact regarding whether the defendant's proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *Torgerson*, 643 F.3d at 1046.

### *Job Applications 2017-2019*

Ms. Alfaro has failed to establish a prima facie case for her unsuccessful job applications because she has not introduced evidence showing she "was qualified for an open position," or that the people who received the promotions were "similarly or equally qualified to her." *Torgerson*, 643 F.3d at 1046. In fact, the record shows the opposite.

The first position Ms. Alfaro applied for, Political Coordinator, required a minimum of four years of political campaign experience. [Smith Decl. ¶ 9; Job Description, Ex. C, ECF No. 52-4.] Ms. Alfaro admitted to the HR director at the time that she did "not really … have any political experience," [Alfaro Dep. 92–93], but the person UFCW hired had three years of political experience. [Smith Decl. ¶¶ 11–12; Ex. D, ECF No. 52-4.] The Senior Legislative Representative position required eight years of experience, and experience on Capitol Hill or as a lobbyist [Job Description, Ex. E, ECF No. 52-5], which Ms. Alfaro did not have. [Alfaro Dep. 93, 94.] In contrast, the person UFCW hired had nineteen years of experience, including over eighteen years of legislative experience and

experience working as a lobbyist.  [Smith Decl. ¶¶ 15–16; Ex. F, ECF No. 52-6.]  The Research Coordinator position required at least ten years of progressive activism experience; Ms. Alfaro did not have this experience.  [Job Description, Ex. G, ECF 52-7; Research Coordinator Email, ECF No. 51-34.]  The person UFCW hired had sixteen years of experience.  [Smith Decl. ¶¶ 19–20; Ex, H, ECF No. 52-8.]  For the second Political Coordinator position, the person UFCW hired had over six years of political experience. [Smith Decl. ¶¶ 23–24; Ex. J, ECF No. 52-10.]  The Federal Legislative Representative position required the ability to analyze and interpret national legislation and develop strategies to influence Congress, field and respond quickly to requests for information from union officers, representatives, and congressional offices, and to stay abreast of legislation relating to labor issues and legislators' views on issues important to labor.  [Smith Decl. ¶¶ 25–26; Job Description, Ex. K, ECF No. 52-11.]  Ms. Alfaro did not have experience performing these skills.  [Application Email 2, ECF No. 51-28.]  The person UFCW hired had nine years of political and legislative experience.  [Smith Decl. ¶¶ 27–28; Ex. L, ECF No. 52-12.]  The Deputy Legislative Director position required at least eight years of substantial experience in legislative work, experience working on Capitol Hill, or as a lobbyist; again Ms. Alfaro did not meet these qualifications.  [Job Description, Ex. M, ECF No. 52-13; Application Receipt Email, ECF No. 51-39.]  The person UFCW placed in this position was a current employee who had over twenty years of political and legislative experience, including lobbying.  [Smith Decl. ¶ 31; Ex. F, ECF No. 52-6.]

Ms. Alfaro has simply failed to produce evidence showing that she was "qualified for the open positions," or that the people who received the promotions were "similarly or

equally qualified to her." *Torgerson*, 643 F.3d at 1046. Ms. Alfaro has also failed to "produce evidence sufficient to create a genuine issue of material fact regarding whether the defendant's proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *Id.* There is simply no evidence upon which "a reasonable jury could return a verdict" for Ms. Alfaro. *Anderson*, 477 U.S. at 248.

### *International Representative*

Ms. Alfaro argues that UFCW failed to evaluate her performance for a possible promotion to an International Representative position, and failed to promote her to this position because of her race or gender. For reasons similar to those that defeat Ms. Alfaro's other failure to promote claims, the Court finds that UCFW is entitled to summary judgment on this claim as well.

UFCW employees who have served for a certain amount of time as General Organizers can become eligible for promotion to International Representative. According to UFCW, Ms. Alfaro became eligible to be evaluated for the International Representative position on July 3, 2020. [Smith Decl. ¶ 35.] Importantly, neither eligibility nor receiving an evaluation guarantee that a candidate will receive this promotion. Instead, according to UFCW, a General Organizer's director conducts a holistic evaluation of their performance and writes a letter recommending or not recommending that they be promoted to International Representative. [*Id.* ¶ 36.] The record shows that Ms. Alfaro's supervisor, Mr. Lauritsen, failed to evaluate her because he did not know that he was supposed to do so. [Lauritsen Decl. ¶¶ 4–5.] But just because UFCW or its employee made a mistake does not automatically mean that UFCW's stated reason for failing to evaluate Ms. Alfaro

17

for the International Representative position was pretextual or that the true reason was discriminatory. *See Johnson v. AT&T*, 422 F.3d 756, 763 (8th Cir. 2005) (explaining that mistakes employers make in employment actions do "not automatically prove that [the employer] was … motivated by unlawful discrimination"). Ms. Alfaro is required to show some evidence which proves that it is more likely that her race or gender motivated Mr. Lauritsen to not evaluate her, rather than a misunderstanding. *See id.* She points to no such evidence. Because Ms. Alfaro has made no showing of such a motivation and provided no evidence from which a reasonable factfinder could infer such a motivation existed, UFCW is entitled to summary judgment on this claim. [4]

In fact, the evidence undermines even an inference that she was not promoted for discriminatory reasons. Aside from Mr. Lauritsen being unaware of the process for considering Ms. Alfaro for the promotion, there were other barriers to her receiving the job. *See, e.g., Torgerson*, 643 F.3d at 1046 (explaining that a plaintiff must show that she was qualified for the position to succeed on a failure to promote claim). One requirement of the International Representative position is that the General Organizer must show that they can run an organizing campaign from beginning to end and that they have run such a campaign in the past. [Smith Decl. ¶ 34.] Ms. Alfaro has not shown evidence that she had

---

[4] The record does not suggest that Ms. Alfaro ever requested review for eligibility for this position or raised specific concerns with her supervisors about why she had not been promoted after her eligibility began in July of 2020. Indeed, had she done so, Mr. Lauritsen might have learned that he was responsible for the first step in the process for her to be considered for the International Representative position. But UFCW does not argue that it was incumbent upon Ms. Alfaro to affirmatively seek this position, and the Court declines to treat the lack of an actual application as a barrier to raising the claim.

this experience.  Although the Court must take the facts in the light most favorable to the non-movant on summary judgment, even doing that here, had Mr. Lauritsen reviewed Ms. Alfaro for this position, the fact that she lacked required experience for the job makes it unlikely that any reasonable factfinder would find in her favor.  Additionally, the record shows that, even had he evaluated her, Mr. Lauritsen would have given Ms. Alfaro a negative evaluation because of a verbal warning she had received recently. [Lauritsen Decl. ¶ 7.]  In sum, Ms. Alfaro is unable to survive summary judgement on her failure-to-promote claim related to the International Representative position.

### *Management Position*

Ms. Alfaro's last claim involving a failure to promote is focused on not being given a managerial position within the meatpacking division.[5]  For reasons similar to those addressed above, this claim fails as well.  Ms. Alfaro was a General Organizer while working in the meatpacking division.  According to UFCW policy, a General Organizer would first need to be promoted to the International Representative position and serve in that role long enough to demonstrate that she possessed the necessary skills for management.  [Smith Decl. ¶ 38.]  The two most recent individuals promoted into the meatpacking division were Mr. Gorham and Sarah Morrisette in 2003 and 2012 respectively.   Both Mr. Gorham and Ms. Morrisette worked as International Representatives for two years before their promotions. [Smith Decl. ¶ 38.] In 2016, UFCW

---

[5] As with the International Representative position, it does not appear that Ms. Alfaro specifically applied for this position, nor that such an application is required.  [Smith Decl. ¶¶ 33–34; Alfaro Dep. 115–19.]

briefly promoted a General Organizer in a different division into a management position, despite that person's lack of service as an International Representative. [*Id.*] However, after observing that the individual did not possess the skills and experience for management, UFCW placed them back in the FAIR unit as an International Representative. [*Id.*] After working as an International Representative for a year, UFCW again promoted them to management. [*Id.*]

Ms. Alfaro was not qualified for the management position because she had not served as an International Representative, and she has not shown that such a reason for her non-promotion was pretextual. For instance, there is no evidence in the record that others routinely skipped the International-Representative step -- in fact the one time UFCW did so, it soon after demoted the individual for performance-based reasons. The record before the Court demonstrates that UFCW's rationale for its decision in this case was based on a non-discriminatory rationale. Accordingly, the Court finds that Ms. Alfaro has not produced sufficient evidence on which a factfinder could reasonably find UFCW failed to promote her into the meatpacking division's management team for a discriminatory reason or that she was qualified for a managerial position. *Torgerson*, 643 F.3d at 1046.

For these reasons, UFCW is entitled to summary judgment on each of Ms. Alfaro's failure to promote claims.

### B. Hostile Work Environment[6]

Ms. Alfaro asserts that the numerous individuals harassed her during her employment at UFCW: Mr. Bustos, Mr. Ariston, Mr. Morrissette, and Ms. Reed. UFCW advances two arguments for why the Court should dismiss Ms. Alfaro's hostile work environment claims. First, UFCW argues that the statute of limitations bars most, if not all of Ms. Alfaro's hostile work environment claims. Second, UFCW argues that even if the statute of limitations does not bar these Ms. Alfaro's, there is no evidence on which a factfinder could reasonably find that UFCW harassed Ms. Alfaro or permitted a hostile work environment within the meaning of Title VII. Therefore, the Court agrees with UFCW and grants Ms. Alfaro's hostile work environment claims.

#### 1. Statute of Limitations

The Court agrees with UFCW that most of the allegations underlying Ms. Alfaro's harassment claim fall outside of the statute of limitations. Indeed, the latest specific date provided for allegedly harassing conduct was in the summer of 2020, and there is nothing concrete alleged after the relevant date of October 15, 2020. The Court must consider "whether the acts about which an employee complains are part of the same actionable

---

[6] Ms. Alfaro raises this claim through allegations of being "harassed" by certain individuals at UFCW, but UFCW frames the argument as alleging a hostile work environment. The Court agrees that her harassment claims are best understood as raising such a claim. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (holding that "[h]ostile environment claims. . . . involve[] repeated conduct") (citing 1 B. Lindemann & P. Grossman, Emp. Discrimination L. 348–49 (3d ed. 1996)). The alleged harassment must have been characterized as "sufficiently . . . pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Clay v. Credit Bureau Enterprises, Inc*., 754 F.3d 535, 540 (8th Cir. 2014) (quoting *Harris v. Forklift Sys*., Inc. 510 U.S. 17, 21 (1993)).

hostile work environment practice, and if so, whether any act falls within the statutory time period" to resolve whether a hostile work environment is timely. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002).

However, some of the actions about which Ms. Alfaro complains involved communications that occurred while she was working on the Hustle team, and that work extended several months past October 15, 2020. And, in a hostile work environment, conduct which falls outside of the statute of limitations can nonetheless be relevant if it is closely related to conduct that falls within the relevant time frame. *Id.* at 117, 122 (a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice'"); *see also Bryant v. Jeffrey Sand Co.*, 919 F.3d 520 (8th Cir. 2019) (employee can still recover on hostile work environment theory for acts occurring more than 300 days before EEOC charge where all the acts relate to the same hostile work environment occurring within the 300-day statutory time period). Therefore, the Court will consider the merits of Ms. Alfaro's harassment allegations.

### 2. Hostile Work Environment: A High Bar

"The standard for demonstrating a hostile work environment under Title VII is demanding, and the statute is not intended to create a general civility code." *Mwassa v. Presbyterian Homes & Servs.*, Case No. 19-cv-01511 (SRN/HB), 2022 WL 658740, at *13 (D. Minn. March 4, 2022) (internal quotations omitted).

> To succeed on a hostile work environment claim, a plaintiff must demonstrate that (1) she belongs to a protected group, (2) she was subject to unwelcome [gender or race-based] harassment, (3) a causal nexus exists between the harassment and the protected group status, (4) the harassment affected a

term, condition, or privilege of employment, and
(5) defendants knew or should have known of the harassment
and failed to take proper action.

*Smith v. Fairview Ridges Hosp.*, 550 F. Supp. 2d 1050, 1056 (D. Minn. 2008), *aff'd*, 625

F.3d 1076 (8th Cir. 2010).

The fourth element of a hostile-work-environment claim requires a plaintiff to

demonstrate that the harassment she experienced "was sufficiently severe or pervasive to

alter the conditions of [her] employment and create a hostile working environment."

*Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 845 (8th Cir. 2006) (citation

omitted). "To be actionable, the conduct complained of must be extreme in nature and not

merely rude or unpleasant." *Id.* at 846. Factors to consider include: "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or

a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance." *Abdel-Ghani v. Target Corp.*, 686 F. App'x 377, 379 (8th Cir. 2017)

(per curiam) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

"Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the

scope of the law"; instead, a "a hostile work environment exists only where the conduct

complained of is extreme in nature and not merely rude or unpleasant." *Guimaraes v.*

*SuperValu, Inc.*, Civ. No. 10-366 (RHK/JSM), 2010 WL 5099648, at *9–10 (D. Minn.

Dec. 8, 2010), *aff'd*, 674 F.3d 962 (8th Cir. 2012) (citation and internal quotations omitted);

*see also O'Brien v. Dept. of Agric.*, 532 F.3d 805, 808 (8th Cir. 2008) (holding that a

supervisor embarrassing, isolating, ostracizing, and scrutinizing an employee's work was

insufficiently severe or pervasive); *Abdel-Ghani*, 686 F. App'x at 378 (finding the

23

following conduct insufficiently severe or pervasive: (1) saying "go back home, to your country," (2) persistent name calling such as "camel jockey, Muslim, Arab, terrorist, and sand ni***r", and (3) "[y]ou should be rounded up in one place and nuke[d].")

***Analysis***

UFCW does not contest that Ms. Alfaro is a member of a protected class, but argues that Ms. Alfaro has not provided enough evidence to allow a factfinder to reasonably find in her favor for the remaining three elements.  The Court finds that Ms. Alfaro's hostile work environment claims both fail because she has not provided evidence that the conduct was due to her protected status, and because the alleged conduct of the individuals was not sufficiently pervasive to constitute a hostile work environment.  Although the Court considers the work-environment as a whole, it is helpful to consider Ms. Alfaro's allegations as to the various people in the UFCW workplace in turn.

Ms. Alfaro identifies two actions taken by Mr. Bustos as harassing.  First, in 2016, he asked her why she was leaving a work assignment before others, and then suggested that Ms. Alfaro's flight was too early. [Alfaro Dep. 33–34, 37, 43. Also, Ms. Alfaro notes that in 2017, Mr. Bustos called her to find out if she was going to attend a meeting that her supervisor Ariston asked her to attend.[7]  [*Id.* 39, 40:3–11.]  She did not attend because she left her job assignment early.  *Id.*

---

[7] Ms. Alfaro explains that when Bustos asked her about her flight, only men were present: Sergio Rocha, Manuel Merida, and Raymundo Diaz, who are all Latino, and Minh Pham, who is Asian. [Alfaro Tr. 43.]

Ms. Alfaro similarly asserts that Mr. Ariston harassed her based on her protected status when he delivered a reprimand letter from the Region 6 director Ms. Ramirez for leaving her assignment early, and when he verbally warned her about another matter around the same time. [Alfaro Dep. 38–39, 45–47.]

Ms. Alfaro claims that Mr. Morrissette, the executive assistant to the Organizing Director, harassed her on May 15, 2020, when he spoke with her on the phone about her failure to complete a Facebook monitoring assignment or join two Zoom meetings, and verbally warned Ms. Alfaro for her failure to inform anyone that she would not be working on one of the days when she missed a Zoom meeting.  [Alfaro Dep. 68–70; Morrissette Decl. ¶¶ 8–12.]

Finally, Ms. Alfaro also argues that Ms. Reed, the lead for the Hustle project, harassed her on several occasions. [Jenny Reed Texts, Ex. 31, ECF No. 51-27.]  The first incident occurred on May 8, 2020, when Ms. Reed texted Ms. Alfaro to inquire why she had not logged into a required Zoom meeting.  [*Id.*]  On that day, Ms. Alfaro informed Ms. Reed that she was having computer problems and could not log into the meeting.  [*Id.*]  Ms. Reed asked for photos of Ms. Alfaro's screen so that she could help her get on the call and then attempted to video call Ms. Alfaro.  [*Id.*]  Ms. Alfaro also alleges that Ms. Reed harassed her by texting her on several more occasions regarding invites to Zoom meetings, letting Ms. Alfaro know that a Zoom meeting was starting, and asking what Ms. Alfaro was working on.  [Alfaro Dep. 77, 80, 81; Jenny Reed Texts, Ex. 32, ECF No. 51-28.]  Ms. Alfaro further states that Ms. Reed harassed her during Zoom meetings. [Alfaro Dep. 66, 74.]  These meetings were meant to discuss their recent Hustle conversations, what went

25

well, and strategies for improvement. [Reed Decl. ¶ 8.] Additionally, there were weekly check-in meetings led by Ms. Reed or another member of the Hustle leadership team. [*Id.* ¶ 9.]

First, most of the communications which Ms. Alfaro characterizes as harassing appear to be more accurately described as supervisory and are not out of step with actions ordinarily taken by an employee's boss or manager to ensure they are doing their work, help them use technology, and hold them accountable. *Trujillo v. Univ. of Colorado Health Scis. Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) ("The hostile work environment that Plaintiff portrays is simply a work environment that exhibits the monitoring and job stress typical of life in the real world. Normal job stress does not constitute a hostile or abusive work environment.") The Court has difficulty characterizing such "monitoring" as out of the ordinary of a modern workplace, particularly one trying to navigate the need to balance flexibility with accountability during a global pandemic.

Though Ms. Alfaro may have experienced this supervision as unduly strict rather than managerial, such actions simply do not rise to the level required to constitute actionable harassment. The Eighth Circuit has, on repeated occasions, found far more extreme and offensive behavior than that involved here to be insufficient to sustain a hostile work environment claim.  *See McMiller v. Metro*, 738 F.3d 185, 188 (8th Cir. 2013) (holding that a male supervisor's inappropriate behavior toward female employee that consisted of kissing the employee, placing his arms around her, and requesting that she remove an ingrown hair near his chin, was not sufficiently severe or pervasive so as to alter terms and conditions of her employment); *O'Brien*, 532 F.3d at 808 (affirming a summary

26

judgment ruling despite evidence showing that plaintiffs' supervisory embarrassed, isolated, and ostracized them, scrutinized their work, and increased their workload after the claimants engaged in protected activity); *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 965–67 (8th Cir. 1999) (observing that unpleasant conduct and rude comments were not so severe or pervasive as to have altered conditions of plaintiff's employment). Against this backdrop, the conduct and communication Ms. Alfaro has described does not rise to the threshold required to sustain a claim of hostile work environment under controlling law.

Moreover, Ms. Alfaro has not provided any direct or indirect evidence, "beyond her own speculation," that these texts, emails, reprimands, and communications were due to her race or gender as opposed to routine aspects of being a supervised employee. *Bradley v. Widnall*, 232 F.3d 626, 632 (8th Cir. 2000), *abrogated on other grounds by*, *Torgerson*, 643 F.3d at 1043 (8th Cir. 2011)). The Court does not expect plaintiffs to produce "smoking-gun evidence of a discriminatory motive." *Ingraham v. Buttigieg*, Civ. No. 20-1857 (PAM/JFD), 2022 WL 2992710, at *3 (D. Minn. July 28, 2022). But there must be some evidence from which a jury could conclude that Ms. Alfaro's race or gender was the motivating factor behind any of these supervisor and co-worker actions. *Id.* That evidence is lacking here.

In sum, the work environment and alleged harassment described by Ms. Alfaro do not support a claim for a hostile work environment based on her race or gender and the Court grants summary judgment in favor of the defendant on these claims.

### C. Retaliation

Ms. Alfaro brings a retaliation claim against UFCW. Specifically, Ms. Alfaro alleges that UFCW retaliated against her by writing her up because she complained about discrimination. [Alfaro Dep. 7:18–21.] UFCW argues that the statute of limitations bars Ms. Alfaro's retaliation claim because it is based on discipline that the UFCW imposed in June 2017, years before the date Ms. Alfaro filed her charge. [UFCW Mem. in Supp. 29, ECF No. 15 (citing Ms. Alfaro Write-Up, Ex. 23, ECF No. 51-22).] Based on the undisputed factual record, the Court agrees that the statute of limitations bars Ms. Alfaro's retaliation claim.

But, even if the statute of limitations did not bar Ms. Alfaro's retaliation claims, they would fail on their merits. To establish a prima facie case of retaliation, a plaintiff must establish that "(1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action." *Thomas v. Corwin*, 483 F.3d 516, 530 (8th Cir. 2007). "To establish the final element, [an employee] must demonstrate that her employer's desire to retaliate was the but-for cause of all the alleged retaliatory actions she suffered." *Ingraham*, 2022 WL 2992710, *6 (citing U*niv. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

There appears to be no dispute that Ms. Alfaro engaged in statutorily protected activity by complaining to UFCW about discrimination. *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (explaining that the filing of incident reports and grievances opposing discriminatory conduct constitutes protected activity). However, Ms. Alfaro has

28

not established that she suffered an adverse employment action or that there was a causal connection.  Ms. Alfaro asserts that she received a write-up over her complaint regarding discrimination.  [Compl. 5.]  "A reprimand is an adverse employment action only when the employer uses it as a basis for changing the terms or conditions of an employee's job for the worse."  *Elnashar v. Speedway SuperAmerica LLC*, 484 F.3d 1046, 1058 (8th Cir. 2007).  When a reprimand does not affect the terms and conditions of the employee's employment, a plaintiff cannot make out a prima facie case of retaliation. *See id.*  Although Ms. Alfaro contends that she received the write-up due to complaining about discrimination, Ms. Alfaro cannot establish the write up, by itself, was a materially adverse employment action when it did not result in any change in the terms or conditions of her job.  *Id.*  She presents no evidence that the write-up changed any terms and conditions of her employment.

Additionally, Ms. Alfaro offers no evidence to suggest that the reprimand was caused by the complaint of discrimination.  Sometimes showing that protected activity was closely followed by the adverse conduct is sufficient, but here an inference of a connection between the two is not supported by the record, even when the evidence is viewed in the light most favorable to Ms. Alfaro.  Ms. Alfaro complained to Ms. Ramirez shortly after the September 2016 incident with Mr. Bustos, and Ms. Ramirez wrote her up for allegedly leaving a work assignment early around nine months later in June 2017.  The Eighth Circuit has found much shorter temporal spans insufficient to support an inference of causation.  *Kipp v. Missouri Highway & Transp. Com'n*, 280 F.3d 893, (8th Cir. 2002) ("Here, the interval of two months between the complaint and Ms. Kipp's termination so dilutes any

inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in Ms. Kipp's favor on the matter of causal link."). Based on the undisputed evidence in this record, the Court concludes the temporal proximity between the protected activity and the alleged retaliation here is too tenuous to support a finding of retaliation.

Other undisputed facts also suggest the absence of a causal link between the protected activity and the alleged retaliation. When Ms. Ramirez disciplined Ms. Alfaro for leaving the April 2017 assignment early, she also wrote up Mayra Morillo, another employee, for leaving the same assignment early against Mr. Ariston's instructions. [Ramirez Decl. ¶¶ 7–10, Ms. Morillo Write-Up, Ex. A, ECF No. 55-1.] Ms. Morillo had never complained of discrimination. [*Id.* at ¶ 5.] Ms. Alfaro contends that she believed she could leave her assignment early. However, even if UFCW mistakenly believed that Ms. Alfaro failed to follow Ariston's instructions, that mistake does not "automatically prove that [UFCW] was instead motivated by unlawful discrimination." *Johnson*, 422 F.3d at 763.

For these reasons, the Court dismisses Ms. Alfaro's retaliation claim.

## D. Termination

Ms. Alfaro also claims that she was wrongfully terminated due to her race or sex. UFCW contends that the undisputed facts show that it terminated Ms. Alfaro's employment because she falsely reported that she was working when she was not, and not for any discriminatory reason. [UFCW Mem. in Supp. 10.] The Court finds that no

reasonable factfinder could conclude that UFCW terminated Ms. Alfaro's employment due to her race or gender.

For a plaintiff to succeed on a race or gender discrimination claim, the plaintiff must show either direct evidence of discrimination or evidence that is sufficient to create an inference of discrimination under the *McDonnell-Douglas* framework. *See Butler v. Crittenden Cnty.*, Ark., 708 F.3d 1044, 1050 (8th Cir. 2013). Evidence is "direct" if it "establishes a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motived the employer's decision." *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003) (cleaned up). Ms. Alfaro has not produced or identified any decisionmaker's statement or conduct that a factfinder could reasonably find directly shows discriminatory animus, so we consider her claims under the *McDonnell-Douglas* framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

To establish a prima facie case of race discrimination or gender discrimination an employee must offer evidence that she: (1) belongs to a protected group, (2) was meeting the legitimate expectations of her employer, (3) suffered an adverse employment action, and (4) was treated differently than similarly situated employees." *Smith v. Mayo Clinic*, 158 F. Supp. 3d 764, 770 (D. Minn. 2016). Under the legitimate expectations element, a plaintiff need not "disprove [a] defendant's alleged business reasons for its adverse employment action." *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994). A plaintiff establishes her prima facie case if, setting aside the defendant's reason for firing the plaintiff, she "was *otherwise* meeting expectations or *otherwise*

qualified." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) (emphasis in original). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment "because a complete failure of proof regarding an essential element renders all other facts immaterial." *See Kennedy v. GN Danavox,* 928 F. Supp. 866, 870 (D. Minn. 1996) (citing *Celotex*, 477 U.S. at 322–23).

UFCW concedes that Ms. Alfaro makes the necessary showing as to elements one (protected class) and three (adverse employment action), but argues that the undisputed facts show that Ms. Alfaro was neither meeting its legitimate expectations, nor treated differently than similarly situated employees. As explained below, the Court agrees.

### Legitimate Expectations

Ms. Alfaro contends that she worked equally hard in her last two years of employment with UFCW as she had during the rest of her employment. [Alfaro Mem. in Opp. 1, ECF No. 65.] While Ms. Alfaro may have worked hard, the record shows Ms. Alfaro was not meeting UFCW's expectations in at least two respects. First, Ms. Alfaro struggled with performance issues during the pandemic, even prior to the incident it cites as its reason for firing her. *Lake*, 596 F.3d at 874. There is no genuine dispute as to the following facts. In April 2020, Ms. Alfaro failed to respond to five comments on a publicly visible thread, two of which required a response, and five private messages, which all required a response. [Morrissette Decl. ¶¶ 5, 9.] Ms. Alfaro also failed to attend a Hustle orientation meeting on May 4. [*Id.* ¶10.] When asked if she worked that day, she responded that she did not work that day due to personal issues but did not tell anyone she was taking the day off. [*Id.*] Ms. Alfaro failed to attend another meeting on May 8. [Reed

Decl. ¶ 6.]  When Ms. Alfaro did not join the meeting, Ms. Reed, the lead on the team, texted to see if she needed assistance getting on Zoom.  [*Id.*]  Ms. Alfaro indicated she was having computer problems.  [*Id.*]  Ms. Reed asked for photos of Alfaro's computer screen or for Alfaro to video call her so Reed could show her how to get into the meeting.  [*Id.*]  Ms. Alfaro did not send photos or answer Ms. Reed's video calls, and never joined the meeting.  [*Id.*]  These facts demonstrate that Ms. Alfaro was not meeting her supervisors' expectations even before UFCW's stated reason for firing her.

In addition, the record demonstrates that in the three months prior to her termination, Ms. Alfaro claimed to be doing required work on Hustle and submitted written reports to that effect, but when her supervisors reviewed information from the software, it revealed that she had not sent any messages in at least the previous 90 days. Morisette Dec. ¶ 14.

These facts demonstrate that Ms. Alfaro was not meeting her employer's legitimate expectations in multiple ways, supporting a finding that Ms. Alfaro failed to establish an essential prong of her prima facie case.

### *Similarly Situated Employees*

Ms. Alfaro fails to meet the fourth prong of the prima facie case as well. In order to support an inference of discrimination, she contends that UFCW treated her differently from other employees because she was the only employee terminated during the pandemic and the only employee terminated for failing to send Hustle messages.  [Compl. ¶¶ 3, 5.] Specifically, she argues that because the report showing that she did not send any Hustle text messages for 90 days also showed that eleven other individuals did not send messages during the same period, her firing must have been based on something other than

performance.  [Alfaro Mem. in Opp. 2.]  However, the record undermines this inference, and demonstrates that the other people who were not fired were not similarly situated to Ms. Alfaro.

First, according to a sworn declaration from Mr. Morrissette, none of these eleven people were actually similarly situated to Ms. Alfaro. [Second Morrissette Decl. ¶ 3.]  Eight of these individuals were assigned to other work during this period, including non-Hustle work and work with other Hustle groups that are not reflected on the report.  [*Id.*] Additionally, the three other individuals listed on the report were not UFCW employees and were no longer working in the group, so it was expected for them to have sent no messages.  [*Id.*]  In addition, Susie Smith attested that she was unaware of any other employees who falsely claimed to be sending Hustle messages when they were not. [Smith Decl. ¶ 41.]  Although Ms. Alfaro suggests she doesn't believe this evidence, she provides no evidentiary basis on which the Court should reject it.  As a result, Ms. Alfaro has not provided specific or tangible evidence identifying any "individuals similarly situated in all respects to her who were treated differently."  *Mayo Clinic*, 158 F. Supp. 3d at 770–71. Ms. Alfaro also does not point to other employees who had previously missed meetings or failed to respond to messages that required a response.  For these reasons, the Court concludes that no factfinder could reasonably find that Ms. Alfaro has shown that UFCW failed to terminate individuals who were similarly situated to her in all or even most respects.

To show that they were treated differently, a plaintiff must show that "there were individuals similarly situated in all respects to her who were treated differently," meaning

those individuals "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Mayo Clinic*, 158 F. Supp. 3d at 770–71 (internal citation and quotation omitted). In *Mayo Clinic*, the court found that a terminated employee failed to establish that the employer treated the employee differently because the employee failed "to provide specific, tangible evidence relating to [other] employees, the standards to which they were held, [the supervisor's] failure to discipline them as [the supervisor] disciplined [the plaintiff], or any specific instances of alleged disparate treatment." *Id.* at 771.

Although Ms. Alfaro is not required to disprove UFCW's stated reason for firing her, *Davenport*, 30 F.3d at 944, she is required to put forth evidence that gives rise to a reasonable inference of discriminatory animus, whether through comparators or another path. *Butler*, 708 F.3d at 1050. Ms. Alfaro has offered no such evidence, and the record instead strongly supports UFCW's proffered reason for termination: that Ms. Alfaro was not doing essential parts of her job during the time-period in question, while falsely claiming that she was. The Court grants UFCW's motion and dismisses Ms. Alfaro's wrongful termination claim.

**E. Different Employment Terms (Unequal Pay)**

Finally, Ms. Alfaro claims that UFCW subjected her to different employment terms than similarly situated employees. UFCW argues that it is entitled to summary judgment because Ms. Alfaro failed to identify during her deposition or discovery responses or allege in her complaint any employment term that UFCW subjected her to that it did not apply to other employees. [UFCW Mem. in Supp. 31.] The Court disagrees with UFCW's assertion

35

that Ms. Alfaro failed to identify a term of employment term that she alleges was disparately applied – indeed Ms. Alfaro claimed in her Complaint she was subject to lower pay than she ought to have received due to her sex and her race. However, although Ms. Alfaro articulated a claim of unequal employment terms, the Court finds that Ms. Alfaro has not presented sufficient facts or evidence on this issue that would allow her to withstand summary judgment.

There are two ways to construe Ms. Alfaro's allegations regarding unequal pay: as a Title VII claim or a claim arising under the Equal Pay Act (EPA); in this case, both frameworks lead to the same result.[8] The Eighth Circuit has held that gender-based claims of disparate pay should be analyzed under the framework set forth in the EPA, even when they are raised under Title VII. "Where a claim is for unequal pay for equal work based upon sex, the standards of the Equal Pay Act apply whether the suit alleges a violation of the Equal Pay Act or of Title VII." *Thomas v. Gray Transportation, Inc.*, No. 17-CV-2052-KEM, 2018 WL 6531661, at *6 (N.D. Iowa Dec. 12, 2018) (quoting *McKee v. Bi-State Dev. Agency*, 801 F.2d 1014, 1019 (8th Cir. 1986)). Under this framework, once a plaintiff has shown that an employer pays "different wages to employees of opposite sexes for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility," the burden shifts to the employer to demonstrate that the difference was based on a reason other than sex such as seniority, merit, experience, or another factor. *Id.*

---

[8] UFCW argues that Ms. Alfaro failed to properly invoke the Equal Pay Act in support of her disparate pay claim, and Ms. Alfaro seeks leave to amend to clarify that she intended to raise such a claim. The Court denies Ms. Alfaro's Motion to Amend [ECF No. 72] because, even had she properly invoked the EPA, such a claim would fail on the merits.

at 1019; *see also Dyer v. R.R. Donnelley & Sons Co.*, Civ. No. 20-2342 (PAM/JFD), 2021 WL 5644332, at *3 (D. Minn. Dec. 1, 2021) (listing elements of an Equal Pay Act claim). The prima facie showing required for a Title VII unequal pay claim based on race is very similar, requiring that the plaintiff show that the employer paid different wages to employees of different races for equal work requiring equal skill, but the showing that the employer must make to refute such a claim follows the traditional *McDonnell Douglas* burden-shifting pattern. *Id*. at *7.

Under either the EPA or Title VII, Ms. Alfaro cannot satisfy the required showing. As she asserted in her complaint, "no same pay as my white male co-workers. I did not get same privileges as they did; their positions were in management as assistants to the Director of the Packing Department and my position . . . continued as a General Organizer." [Compl. 5.]  But Ms. Alfaro points to no facts suggesting that any of her white male comparators held jobs requiring the same level of skill, effort, and responsibility as hers. [Alfaro Dep. 107.]  Although she mentions other workers in the meatpacking division and elsewhere, she does not show that any of those workers held her same position, had similar credentials and experience to her, or did the same sort of work.  [*Id.*]  And UFCW points to evidence in the record suggesting that none of the white male employees she points to are in fact similarly situated.  UFCW Memo. in Supp. at 12–15, ECF No. 65.]

For these reasons, the Court finds that UFCW is entitled to summary judgment on her disparate pay claim, regardless of whether it is framed as a claim for sex discrimination under the EPA or race discrimination under Title VII.

**I.      Order**

For the foregoing reasons, **IT IS HEREBY ORDERED that:**

1.  Defendant's Motion for Summary Judgment [ECF 47] is **GRANTED**.

2.  Plaintiff's Motion to Supplement/Amend [ECF 71] is **DENIED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: September 12, 2023                          *s/Katherine Menendez*
                                                 Katherine Menendez
                                                 United States District Judge

38